IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| IQ SOLUTIONS, INC., | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No.: SAG-24-03201 |
| MANHATTAN STRATEGY GROUP, LLC, *et al.*, | * | |
| Defendants. | * | |

## MEMORANDUM OPINION

Plaintiff IQ Solutions, Inc. ("IQS") filed an amended complaint against Manhattan Strategy Group, LLC ("MSG") and Shannon Loomis (collectively, "Defendants") seeking redress for alleged breach of a non-compete agreement, misappropriation of its trade secrets, tortious interference with contract, breach of fiduciary duties, and civil conspiracy, ECF 11. Defendants have filed a Motion to Dismiss the Amended Complaint ("Motion"), ECF 15. The issues have been fully briefed, ECF 16, 17, and no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). For the following reasons, Defendants' Motion will be granted in part and denied in part.

I.   BACKGROUND

The following facts are derived from the Amended Complaint, ECF 11, and are taken as true for purposes of evaluating Defendants' Motion. IQS and MQS provide consulting services in the health care industry and both are headquartered in the D.C. suburbs in southern Maryland. *Id.* ¶¶ 8,9. Loomis joined IQS in June, 2017 to serve as the project coordinator for a contract with the Substance Abuse and Mental Health Services Administration ("SAMHSA"). *Id.* ¶ 10 IQS had repeatedly won the contract and had provided services to SAMHSA since 2014. *Id.* ¶¶ 1, 15

In 2024, Loomis resigned her position, effective March 20, 2024. *Id.* ¶ 12. At the time of her resignation, the industry was anticipating that SAMHSA would again solicit bids for a follow-on contract, since its existing contract with IQS was scheduled to end on August 29, 2024. *Id.* ¶ 15. Sure enough, on April 3, 2024, SAMHSA issued its Request for Task Order Proposals for the follow-on contract. *Id.* ¶ 18.

During the last two procurement cycles, IQS had contracted with the American Institutes for Research ("AIR") to provide services for the contract. *Id.* ¶ 17. AIR initially indicated that it would continue to team with IQS for its new bid, but after the solicitation was released, AIR decided not to team with IQS. *Id.* ¶ 19. Instead, upon information and belief, AIR teamed with MSG on its bid. *Id.* ¶ 20.

On or before the proposal due date of May 3, 2024, IQS and MSG submitted proposals. *Id.* ¶ 21. On August 16, 2024, SAMSHA notified IQS that the contract had been awarded to MSG. *Id.* ¶ 22. The "debriefing letter" indicated that IQS had the second highest technical score, behind MSG. *Id.* ¶ 23. Factors considered in assigning a technical score include the organization's "key personnel." *Id.*

IQS and MSG held a "transition meeting" to discuss transitioning the contractual responsibilities. *Id.* ¶¶ 24, 25. Loomis attended as MSG's Project Director for the contract, the same role she had held at IQS. *Id.* ¶ 25. Loomis's participation for MSG would have boosted MSG's technical score because she had been the project director for years. *Id.*

During the transition meeting, Loomis asked IQS to provide specific documents to MSG, including some that were several years out of date and would not have been used in her day-to-day work. *Id.* ¶ 26. A forensic computer examination demonstrated that in the week before Loomis's departure from IQS, between March 14 and March 20, 2024, Loomis accessed several

2

sensitive and proprietary files she would have no reason to access, including information relating to the SAMHSA Contract. *Id.* ¶ 47. Additionally, in the week leading up to March 20, 2024, Loomis downloaded a number of SAMHSA-related documents that were atypical of her usual activity and were unaccompanied by any uploads or updates explaining the reason for her access. *Id.* ¶ 48. On her last day in the office, March 20, 2024, Loomis accessed documents relating to the SAMHSA contract and upcoming proposal, in addition to business development files 49. At least two of the files were in a folder with "limited exclusive access only available to IQS's controller and operations chief" and had no relation to her work as project director for SAMHSA. *Id.* ¶ 50. By Loomis's last day of work, her work duties had already been transitioned to another Project Director. *Id.* ¶ 51. She therefore had no work-related reason to be accessing or downloading documents relating to the SAMHSA contract or upcoming bid. *Id.* ¶ 52-53. Some of these same documents, however, are among the document she requested during the transition meeting. *Id.* ¶¶ 54–56.

IQS also alleges, "on information and belief," that Loomis conspired to solicit AIR's services for MSG on the re-compete bid, *id.* ¶ 60, and that Loomis solicited Sofia Cabrera, a Training and Outreach Specialist, to resign from IQS and work for MSG. *Id.* ¶¶ 62–64.

## II.   LEGAL STANDARDS

Under Rule 12(b)(6), a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss. *See In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by

a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Federal Rule of Civil Procedure 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for all civil actions[.]") (quotation omitted); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). However, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Further, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if … [the] actual proof of those facts is improbable and … recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). However, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

### III.     Discussion

#### A.     Breach of Contract (Count I)

In Count I, IQS alleges that Loomis breached the Employee Privacy and Non-Compete Agreement she signed upon beginning her employment. In their Motion, Defendants assert that Count I must be dismissed in its entirety because the restrictive covenants are facially overbroad and unenforceable as a matter of law. This Court agrees in part.

The provisions in question read as follows:

> **3. Solicitation of Clients**: I agree that during the term of my employment with IQ and for a period of eighteen (18) months immediately following my termination for any reason thereof, I will not, directly or indirectly, either for my own use or for the benefit of any other person, firm or corporation, divert or take away, or attempt to divert or take away, call on or solicit, or attempt to call on or solicit, any of IQ's clients or prospective clients I called on, solicited, serviced or became acquainted with while employed by IQ. A "prospective client" means any person or entity contacted by me or any other employees of IQ known by me to have been contacted

5

> in an effort to market, bid out or sell products and services offered by IQ in the twelve (12) month period before my employment ended, for whatever reason.
>
> **4. Solicitation of Employees, Consultants, or Contractors**: I will not solicit any employees, consultants, or contractors of IQ for employment in competition with IQ at any time during my employment or for eighteen (18) months after termination, for whatever reason, of my employment.
> .

ECF 11-2. The parties agree that both provisions at issue are restrictive employment covenants governed by Maryland law. Restrictive covenants are restraints on trade and must be reasonable to be valid. *Severn Mktg. Assocs., Inc. v. Doolin*, 2010 WL 3834994, at *3 (D. Md. Sept. 29, 2010) (citing *Ruhl v. Bartlett Tree Co.*, 245 Md. 118, 225 A.2d 288, 291 (Md. 1967)). Under Maryland law, a restrictive covenant is enforceable only if: (1) the employer has a legally protected interest; (2) the covenant is no wider in scope and duration than reasonably necessary; (3) it does not impose an undue hardship on the employee; and (4) it does not violate public policy. *See Occupational Health Centers of the Sw., P.A. v. Toney*, 2017 WL 1546430, at *11 (D. Md. Apr. 28, 2017); *see also Ruhl*, 245 Md. 118 at 291. In determining the enforceability of a restrictive covenant, courts begin "by assessing whether the covenant, as originally written, was reasonable on its face." *Deutsche Post Glob. Mail, Ltd. v. Conrad*, 116 F. App'x 435, 441 (4th Cir. 2004) (citing *Holloway v. Faw, Casson & Co.*, 319 Md. 324, 572 A.2d 510, 518-19 (1990). If a covenant "meet[s] some threshold of facial reasonableness," *id.*; courts next conduct a fact-intensive analysis of the enforceability of a clause under the circumstances of the particular case, *Severn*, 2010 WL 3834994, at *3. This as-applied analysis may consider several factors, including:

> whether the restriction is reasonable in area and duration, the hardships its enforcement might impose on the employee, the interests of the public, and whether the employee sought to be enjoined performs unique services, is soliciting customers, using trade secrets, assigned routes, customer lists, or is exploiting personal contacts established between the employee and his customers during his employment.

*Id.* (quoting *Millward v. Gerstung Int'l Sport Educ., Inc.*, 268 Md. 483, 302 A.2d 14, 16 (Md. 1973)).

Turning first to the "Solicitation of Clients" provision, Defendants argue that it is "facially overbroad because it is not narrowly tailored to protect any legitimate business interest, such as goodwill." ECF 15-1 at 12. Generally, efforts reasonably tailored to protect goodwill are permissible. *See Ameritox, Ltd. v. Savelich*, 92 F. Supp. 3d 389, 399 (D. Md. 2015). In support of their contention that this provision expands beyond that use, Defendants cite two portions of the provision: the inclusion of "prospective clients" and the use of the phrase "became acquainted with," which defendants construe to include persons that Loomis never met and would not, therefore, have generated any goodwill. IQS correctly notes that Maryland law allows this Court to "blue pencil" the provision's language to excise offending clauses that are severable without adding or rearranging other language. *See Allegis Group v. Bero,* 689 F. Supp. 3d 81, 121 (D. Md. 2023). The two provisions cited by MSG are easily severable from the provision's existing language, leaving the following, which would be narrowly tailored to promote retention of goodwill:

> I agree that during the term of my employment with IQ and for a period of eighteen (18) months immediately following my termination for any reason thereof, I will not, directly or indirectly, either for my own use or for the benefit of any other person, firm or corporation, divert or take away, or attempt to divert or take away, call on or solicit, or attempt to call on or solicit, any of IQ's clients I called on, solicited, or serviced while employed by IQ.

The "blue penciled" version is narrowly tailored to protect IQS's goodwill. Although it would continue to prevent Loomis from soliciting IQS's clients with whom she had interaction, "Maryland has enforced restrictive covenants barring solicitation of all of an employer's clients." *Ameritox*, 92 F. Supp. at 399 (citing *Fowler v. Printers II, Inc.*, 89 Md. App. 448, 465, 598 A.2d

7

794, 802 (1991); *Tuttle v. Riggs–Warfield–Roloson, Inc.*, 251 Md. 45, 47, 246 A.2d 588, 589 (1968)).

Next, however, this Court considers Defendants' facial challenges to the Employee, Consultants, and Contractors provision. The validity of this provision presents a harder question, because its broad language does not tie its restrictions to avoiding misuse of goodwill Loomis developed on the job. Instead, it broadly prohibits her from "solicit[ing] any employees, consultants, or contractors of IQ" without reference to whether Loomis ever interacted with those individuals or entities at all. *See Ameritox*, 92 F. Supp. 3d at 399 ("By barring Savelich from soliciting *any* Ameritox employees, the covenant is not narrowly tailored to preventing Savelich from trading on his goodwill … Accordingly, the employee nonsoliciation covenant is overly broad."). "Blue penciling" cannot save this provision, as this Court would have to add limiting language and cannot simply remove offending phrases.

In sum, the Employee, Consultant and Contractor provision is overbroad and unenforceable on its face. The Solicitation of Clients provision is not. Defendants may, of course, challenge the validity of that provision and its application upon the development of a fuller evidentiary record. At this juncture, however, their Motion to Dismiss Count I will be granted as to the Employee, Consultant and Contractor provision and denied as to the Solicitation of Clients provision.

### B.     Trade Secrets Claims (Counts II and III)

In Count II, IQS alleges that Defendants misappropriated its trade secrets in violation of the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1832 *et seq*. To state a claim under DTSA, a plaintiff must allege that: "(1) it owns a trade secret which was subject to reasonable measures of secrecy; (2) the trade secret was misappropriated by improper means; and (3) the trade secret implicates interstate or foreign commerce." *Philips N. Am. LLC v. Hayes*, 2020 WL

5407796, at *7 (D. Md. Sept. 9, 2020) (citing 18 U.S.C. § 1836(b)(1)). Similarly, in Count III, IQS alleges violation of the near-identical Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code, Com. Law §§ 11-1201, *et seq.*, which requires the same showing (without the commerce requirement). Defendants posit that both trade secrets claims are subject to dismissal because IQS has not plausibly alleged, with particularity, that the information taken meets the definition of a trade secret, that it took sufficient efforts to maintain the confidentiality of its alleged trade secrets, or that MSG misappropriated or used any trade secrets.

"[A]ll forms and types of financial, business, scientific, technical, economic, or engineering information," regardless of whether it is tangible or intangible, or how the information is stored, memorialized, or maintained, can qualify for protection as a "trade secret" under the DTSA. 18 U.S.C. § 1839(3). However, such information only becomes a trade secret if (1) the owner of the trade secret takes "reasonable measures to keep such information secret," and (2) the information "derives independent economic value ... from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure of use of the information." *Id.* § 1839(3)(A)–(B). Similarly, MUTSA defines a "trade secret" as any information that the owner "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," and takes reasonable efforts to maintain its secrecy. Md. Code Ann., Com. Law § 11-1201(e). To determine whether information is a trade secret, Maryland courts assess: (1) the extent to which the information is known outside of plaintiff's business; (2) the extent to which it is known by employees and others involved in plaintiff's business; (3) the extent of measures taken by plaintiff to guard the secrecy of the information; (4) the value of the information to plaintiff and

9

competitors; (5) the amount, effort, or money expended by plaintiff in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated by others. *AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 95 (4th Cir. 2018) (citing Restatement (First) of Torts § 757 cmt. b).

This Court agrees with MSG that, as presently pleaded, the Complaint does not adequately allege that the accessed and misappropriated documents are trade secrets and does not contain sufficient factual allegations to permit the Court to draw that inference. While the file names might provide sufficient information for a person with greater familiarity to understand the file's contents, this Court is unable to understand, from the file names, the nature of the information Loomis is alleged to have accessed. In particular, IQS only alleges that two of the files were in a "folder with limited, exclusive access," and this Court has no understanding of the contents of those files. IQS, obviously, is privy to the contents of the files and can plead additional detail about the nature of the information to allow this Court to determine whether or not the material plausibly merits trade secret protection. While IQS has amply alleged that Loomis accessed company information without a valid business reason, it has not, at this stage, adequately stated a trade secret claim under DTSA or MUTSA. Finally, even had trade secrets been adequately alleged, IQS has not provided the "specific factual averments of disclosure or use" to allow this Court to "impute the employee's acquisition of trade secrets to his new employer," here MSG. *See RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1175 (D. Colo. 2018). IQS's "information and belief" assertion that MSG used IQS's trade secrets to win the contract requires further factual explication to suffice.

Defendants' Motion to Dismiss Counts II and III will be granted.

### C.  Tortious Interference with Contract (Count IV)

Defendants first argue that all of the tort claims asserted by IQS are displaced or preempted by MUTSA. ECF 15-1 at 24. That argument is unavailing at this stage, because plaintiffs are permitted to plead their claims in the alternative, and because not all of the assertions IQS is making pertain to trade secrets alone, but to other types of confidential information and breaches of fiduciary duty. Although MUTSA contains an express preemption provision, courts in this district have repeatedly held that MUTSA does not foreclose state law claims based on non-trade secret information. *See Brightview Grp., LP v. Teeters*, 2021 WL 1238501, at *21 (D. Md. Mar. 29, 2021) (collecting cases); *see also Structural Pres. Sys., LLC v. Andrews*, 2013 WL 3820023, at *5 (D. Md. July 23, 2013) (plaintiff's claim for breach of a confidentiality provision was not preempted to the extent it was based on proprietary information not qualifying as a MUTSA trade secret).

Defendants next contend that IQS has failed to state a claim against MSG for tortious interference with its contract with Loomis. To state a claim for tortious interference with contractual relations, a plaintiff must adequately allege "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiff in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants; and (4) actual damage and resulting loss." *Kaser v. Fin. Prot. Mktg., Inc.*, 376 Md. 621, 628–29 (2003) (citations omitted). Tortious interference with contract requires that the act of interference be "independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships." *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs.*, 336 Md. 635, 657 (1994).

Mere recruiting of an employee to leave one employer for another is not, of course, wrongful or unlawful even if it benefits one company at the expense of the other. But here, IQD has pleaded that, "MSG knew about the Employment Agreement and willfully and intentionally interfered with IQS's contract rights under the Employee Privacy and Non-Compete Agreement by causing Ms. Loomis to misappropriate IQS's confidential information and trade secrets for MSG's benefit and in breach of her Employment Agreement." ECF 11 ¶ 100. Taking those factual allegations as true, as this Court must in assessing a motion to dismiss, IQS has adequately pleaded that MSG engaged in independently wrongful conduct that was intended to interfere with IQS's business relationships.

Although MSQ's legal and factual arguments about the viability of certain of these bases for IQS's interference claim may re-emerge later, with more information from discovery, taking the facts in the Complaint as true, IQS has successfully stated a claim.

### D. Breach of Fiduciary Duties (Count V)

In Count V, IQS alleges that Loomis breached her fiduciary duty to the company during her employment by soliciting its current employees, contractors, and customers and misappropriating its confidential information to IQS's detriment. "To establish a breach of fiduciary duty as an independent cause of action, a plaintiff must show: '(i) the existence of a fiduciary relationship; (ii) breach of the duty owed by the fiduciary to the beneficiary; and (iii) harm to the beneficiary.'" *Plank v. Cherneski*, 469 Md. 548, 599, 231 A.3d 436 (2020) (quoting *Froelich v. Erickson*, 96 F. Supp. 2d 507, 526 (D. Md. 2000), *aff'd sub nom.* by *Froelich v. Senior Campus Living, LLC*, 5 F. App'x 287 (4th Cir. 2001)).

The plain allegations in the Amended Complaint are that Loomis downloaded materials relevant to the SAMHSA contract bid during her final weeks working for and being paid by IQS

(while she was in a fiduciary relationship and owed IQS a fiduciary duty), and that Loomis used those materials in concert with her new employer to prepare a winning bid, depriving IQS of its longstanding contract. There is a distinct difference between simply "preparing to compete" with a former employer and gathering the former employer's confidential information for use in that competition. IQS's factual allegations suffice to state a breach of fiduciary duty claim.

### E.  Aiding and Abetting Breaches (Count VI)

For the reasons set forth above, under the low bar applicable at this early stage of the proceeding, IQS has adequately alleged that MSQ aided and abetted Loomis's breaches of her Solicitation of Clients provision in her employment agreement and her fiduciary duty to IQS.

### F.  Civil Conspiracy (Count VII)

Finally, in Count VII, IQS alleges that Defendants conspired to steal and misuse IQS's information and property. "Under Maryland law, civil conspiracy is defined as the 'combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff.'" *Marshall v. James B. Nutter & Co.*, 758 F.3d 537, 541 (4th Cir. 2014) (quoting *Hoffman v. Stamper*, 385 Md. 1, 867 (2005)). To prevail, a plaintiff must demonstrate both the agreement itself, and also the commission of an overt act in furtherance of the agreement, which caused the plaintiff actual injury. *Id.*; *see also Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176 (1995). Because the "[i]ndependent acts of two wrongdoers do not make a conspiracy" a plaintiff must allege facts sufficient to infer the existence of an agreement or concerted action. *Murdaugh Volkswagen, Inc. v. First Nat. Bank of South Carolina*, 639 F.2d 1073, 1076 (4th Cir. 1981).

Of course, once Loomis joined MSG, she could not conspire with her employer. The intracorporate conspiracy doctrine maintains that because the acts of corporate agents are legally attributed to the corporation itself, "a conspiracy between a corporation and its agents, acting within the scope of their employment, is a legal impossibility." *Marmott v. Maryland Lumber Co.*, 807 F.2d 1180, 1184 (4th Cir. 1986). Subject to certain exceptions, the intracorporate conspiracy doctrine "[i]n essence, [] means that a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *Baltimore-Washington Tel. Co. v. Hot Leads Co., LLC*, 584 F. Supp. 2d 736, 744 (D. Md. 2008).

Here, IQS has pleaded facts suggesting that, before Loomis's departure from IQS, Loomis accessed and downloaded material to prepare to compete on the SAMHSA contract. And IQS has pleaded that MSG used the material from Loomis to compete and win the contract award. But the Complaint is devoid of allegations that MSG knew of or agreed to the actions Loomis took prior to her departure from IQS. In other words, at present, IQS offers no facts to establish a conspiracy that pre-existed Loomis's departure.

Facts revealed during the course of discovery may, of course, allow IQS to adequately plead this claim. At present, however, the claim is subject to dismissal.

IV.   **CONCLUSION**

For the reasons set forth above, Defendants' Motion to Dismiss, ECF 15, is GRANTED WITHOUT PREJUDICE as to Counts II, III, VII, and the portion of Count I relating to the Employees, Consultants, and Contractors provision, and DENIED as to the remaining claims. A separate Order follows.

Dated: May 7, 2025                                           _____/s/_____
                                                                               Stephanie A. Gallagher
                                                                               United States District Judge